UNITED STATES, Plaintiff, Appellee,

v.

PARCELS OF LAND, etc., et al.,
Defendants, Appellees,

Appeal of Lionel
LALIBERTE, Claimant.

No. 89–1812.

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1990.

Decided April 30, 1990.

Rehearing Denied May 30, 1990.

John C. McBride, with whom Thomas Kerner and McBride, Wheeler & Widegren, Boston, Mass., were on brief, for claimant, appellant.

Jeffrey S. Robbins, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is an appeal from a judgment of the district court that orders the forfeiture to the United States of several parcels of real estate owned by appellant Lionel Laliberte. The United States sought forfeiture of the property under 21 U.S.C. § 881(a)(6), alleging that the property constituted proceeds traceable to the unlawful sale of controlled substances by Laliberte. After a series of discovery skirmishes, the district court granted the government's motion for summary judgment, and ordered the forfeiture of the property. Laliberte now appeals from this judgment, contending that the government failed to introduce sufficient undisputed evidence of probable cause to warrant a grant of summary judgment. Laliberte also raises a number of constitutional challenges to the forfeiture. For the reasons that follow, we affirm the order of forfeiture.

**1.** 21 U.S.C. § 881 (1988) provides in pertinent part:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

. . . .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or in-

## I. PROBABLE CAUSE

21 U.S.C. § 881(a)(6) provides that property constituting proceeds traceable to the illegal exchange of controlled substances is subject to forfeiture to the United States.[1] 21 U.S.C. § 881(d) instructs that the burden of proof in such forfeiture actions is governed by the customs laws, 19 U.S.C. § 1615.[2] Under 19 U.S.C. § 1615, the government first must establish probable cause to believe that the defendant property constitutes the proceeds of drug trafficking. Once probable cause is shown, the burden then shifts to the claimant to prove by a preponderance of the evidence that the property is not the proceeds of narcotics sales. See *United States v. $250,000 in United States Currency*, 808 F.2d 895, 897 (1st Cir.1987).

To establish probable cause, the government must only show a " 'reasonable ground for belief of guilt; supported by less than prima facie proof but more than mere suspicion.' " *Id.* (quoting *United States v. $364,960.00 in United States Currency*, 661 F.2d 319, 323 (5th Cir. Unit B Nov. 1981)); *see also United States v. $4,255,000*, 762 F.2d 895, 903 (11th Cir. 1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986); *United States v. One 1974 Porsche 911–S*, 682 F.2d 283, 285 (1st Cir.1982). This showing can be made with circumstantial evidence or evidence that would be inadmissible at trial, so long as the evidence is reliable. *See United States v. $250,000*, 808 F.2d at 899. Furthermore, the government need not trace the property to specific drug transactions. Rather, all that is required is that a court be able to look at the "aggregate" of

tended to be used to facilitate any violation of this subchapter. . . .

**2.** 21 U.S.C. § 881(d) (1988) provides in pertinent part:

The provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws . . . shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under any of the provisions of this subchapter, insofar as applicable and not inconsistent with the provisions hereof. . . .

the facts and find reasonable grounds to believe that the property probably was derived from drug transactions. *See id.* at 899–900; *United States v. $41,305.00 in Currency and Traveler's Checks,* 802 F.2d 1339, 1343 (11th Cir.1986); *United States v. $4,255,000,* 762 F.2d at 904.

■ In support of its motion for summary judgment below, the government assembled a considerable amount of evidence to establish its claim that the defendant properties constituted the proceeds of drug trafficking activity conducted by Laliberte.[3] Most of this evidence was presented in the affidavit of Joseph Coons, Special Agent of the Drug Enforcement Administration. Additional affidavits were submitted from Albert Brackett, Chief of the Hudson, New Hampshire Police Department; Frank Waterman, Detective–Sergeant of the Lowell Police Department; Kathleen Bennett, Special Agent of the Drug Enforcement Administration; and David Nicholson, Special Agent of the Internal Revenue Service. The affidavits essentially stated the following:

(1) From 1979 through 1988, the average annual adjusted gross income reported by Laliberte and his wife, Joanne Laliberte, was $27,690.

(2) Despite this modest income, Laliberte's purchases totaled in the millions of dollars during this time period.

(3) With respect to Property # 1, the expenditures included: (a) $110,000 to purchase a one-third interest in April, 1983; (b) $400,000–$500,000, in cash, for renovations to the property between April, 1983 and December, 1984; (c) $80,000 and the assumption of an existing mortgage of $200,000 to purchase the remaining two-thirds interest in December, 1984; and (d)

approximately $1.5 million to purchase electronic and computerized health equipment located on the property.

(4) With respect to Property # 2, Laliberte expended $20,000 in February, 1984.

(5) With respect to Property # 3, Laliberte made a $15,000 down payment on a purchase price of $150,000 in January, 1987.

(6) Finally, with respect to Property # 4, Laliberte made a $25,000 down payment and assumed an $85,000 mortgage on a purchase price of $110,000 in August, 1987.

In addition to these expenditures on the defendant properties, the affidavits further stated that Laliberte acquired:

(7) property in Hudson, New Hampshire in May, 1983 for $125,000, of which $75,000 was paid in cash and the remainder in bank checks;

(8) a summer home in Moultonboro, New Hampshire in May, 1984 for $220,000, owned mortgage-free;

(9) twenty-seven acres in Amherst, New Hampshire in 1981, and two acres of waterfront property on Lake Winnipesaukee in Moultonboro, New Hampshire prior to January, 1987, for unknown consideration, but with a combined value of at least $700,000;

(10) property in Westford, Massachusetts prior to January, 1987, for unknown consideration and with unknown value; and

(11) various cars, boats, snowmobiles, jet skis and other equipment valued at over $270,000.

The sheer magnitude of Laliberte's expenditures supports an inference that his

---

**3.** The particular properties at issue in the summary judgment motion and on appeal are:

Land, buildings and improvements located at 78–98 Middlesex Street in Lowell, Massachusetts, including all equipment and personalty located thereon and including all assets of the New You Fitness Center located thereon (hereinafter "Property # 1");

Land, buildings and improvements located at 155–159 Middlesex Street, Lowell, Massachusetts, (hereinafter "Property # 2");
Land, buildings and improvements located at 230 Middlesex Street, Lowell, Massachusetts (hereinafter "Property # 3"); and
Land, buildings and improvements located at Lot C, described in Plan Book 152, Plan 8, at Frost Road in Tyngsboro, Massachusetts, (hereinafter "Property # 4").

property acquisitions were funded with the proceeds of drug trafficking; Laliberte's millions of dollars in purchases far exceeded his reported average annual income of $27,690, and there was no other apparent legitimate source of money to account for this magnitude of expenditures. *See, e.g., United States v. $250,000*, 808 F.2d at 899 (noting the absence of any apparent legitimate sources of income that could account for the property sought to be forfeited); *United States v. Brock*, 747 F.2d 761, 762–63 (D.C.Cir.1984) (same); *United States v. $2,500 in United States Currency*, 689 F.2d 10, 16 (2d Cir.1982) (same), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984); *United States v. $364,-960*, 661 F.2d 319, 324 (5th Cir. Unit B Nov. 1981) (stating that the "sheer quantity of currency" alone could support an inference that it was connected to drug trafficking). Moreover, the government's affidavits presented additional evidence to further strengthen this inference. First, the affidavits stated that Laliberte frequently dealt in unusually large sums of cash, which is another indication that the money was the proceeds of drug transactions. *See, e.g., United States v. $215,300 United States Currency*, 882 F.2d 417, 419 (9th Cir.1989); *United States v. $4,255,000*, 762 F.2d at 903; *see also United States v. One Parcel of Real Property Known as 6 Patricia Drive*, 705 F.Supp. 710, 719 n. 14 (D.R.I.1989). According to Raymond Martineau, Laliberte's former partner in the fitness center located on Property # 1, the $400,000 in renovations to Property # 1 between 1983 and 1984 was paid for in cash, brought in by Laliberte in paper bags full of $10 and $20 bills. Additionally, from mid–1984 to February, 1988, Laliberte brought in shopping bags full of loose cash whenever the fitness center was running low on funds—typically every two or three weeks—in amounts of $20,000 to $30,000. The seller of the Hudson, New Hampshire property reported that Laliberte paid him with $60,000 in cash in a briefcase, and $12,000 in cash in a grocery bag. Finally, Laliberte's mother was stopped at Logan

Airport in December, 1983 attempting to board a flight to Florida, and was found to be carrying $70,000 in cash, which she said belonged to her son.

In addition to this evidence of massive cash expenditures, the government's affidavits also stated that Laliberte attempted to shield this money from the attention of the government, which is a further indication of drug trafficking. *See United States v. $4,255,000*, 762 F.2d at 903 (noting that depositors to a bank account that was forfeited did not request and sometimes refused to accept receipts for their cash deposits); *United States v. $215,300*, 882 F.2d at 419. Laliberte instructed Martineau not to make bank deposits of the renovation money in amounts greater than $10,000 in order to avoid scrutiny by the Internal Revenue Service. Laliberte also told his accountant not to itemize his personal investment in Property # 1 on his tax return despite the tax benefits he could have realized from doing so.

Apart from the inferential evidence concerning Laliberte's spending habits, more direct evidence was presented in the government's affidavits to link Laliberte with drug trafficking activities. For example, the affidavits related certain statements of Paul McCann,[4] who was a partner in certain drug trafficking activities with William Cloutier, who in turn had been one of Laliberte's partners. McCann stated that Cloutier and Laliberte had run a joint business, purchasing cocaine in Florida for resale in the Lowell, Massachusetts area. McCann stated that he personally had observed Cloutier and Laliberte with cocaine in their possession after returning from Florida. The affidavits also related certain statements of Charles Bernier, who was another of Cloutier's and Laliberte's partners. Bernier stated that he had stored marijuana for Cloutier and Laliberte. Moreover, he stated that Laliberte frequently sent his mother to Florida to purchase cocaine. All of this testimony was corroborated by credit card receipts indicating numerous trips by Laliberte to Florida,

---

4. Even though this material is hearsay, it may be considered in the determination of probable cause. *See United States v. $250,000*, 808 F.2d at 899.

and by the fact that Laliberte's mother was stopped at Logan Airport on her way to Florida with $70,000 in cash.

To further cement its case, the government detailed in its affidavits a meeting between DEA Special Agent Bennett and Laliberte to discuss the purchase of cocaine. Present at this meeting was a confidential informant who had previously received cocaine from Laliberte, and who had set up the meeting between Bennett and Laliberte. Bennett informed Laliberte that she liked the quality of cocaine that had been given to the informant, and would be in touch with Laliberte concerning future purchases.

The statements of a number of other confidential informants who had provided substantiated information in the past also were related in the affidavits as implicating Laliberte in marijuana and cocaine trafficking. One of these informants stated that the drug operation in which Laliberte and Cloutier had been partners netted $3 million per year.

Finally, the government listed in its affidavits the results of an authorized search of Laliberte's residence on October 7, 1988. Among other items, the search uncovered fourteen pounds of marijuana, a 9 mm machine pistol, a 12 gauge shotgun, six boxes of ammunition, a .357 caliber revolver, and an Ohaus Triple Beam weighing scale.

 Despite these details revealing extensive drug trafficking activities and massive expenditures, Laliberte argues that the district court erred in granting summary judgment because the government failed to demonstrate probable cause to believe that the defendant properties constituted the proceeds of drug trafficking activities by Laliberte. Since the existence of probable cause is a question of law, the district court's probable cause determination is subject to plenary review. *See United States v. $250,000*, 808 F.2d at 897–98. We find that the government has more than adequately demonstrated probable cause.

The heart of Laliberte's argument involves his claim that the record contains information clearly showing that he had "substantial sources" of legal income. Giv-

en these "substantial sources" of legal income, Laliberte contends that the government could not forfeit the defendant properties unless it established a concrete nexus between the properties and particular drug transactions, which he argues it did not. We are not persuaded.

First, we find scant evidence in the record of any "substantial" sources of legitimate income. Laliberte attempts to establish these sources by listing various real estate and financial transactions conducted by him prior to 1982, which is the earliest date the government's affidavits allege drug trafficking on his part. Specifically, Laliberte lists:

(1) a $100,000 deposit into an account at the Nashua Trust Bank in July, 1980;

(2) two additional deposits totaling $100,000 into an account at the Nashua Trust Company in 1980 and 1983;

(3) an August, 1980 purchase and sale of property in partnership with William Cloutier that resulted in a profit to Laliberte of $22,500;

(4) a January, 1981 purchase of 26.6 acres of land in Amherst, New Hampshire in partnership with William Cloutier, currently valued at $600,000;

(5) a 1980 purchase of property by Laliberte's mother that eventually was sold at a profit of $125,000 for Laliberte; and

(6) a 1980 purchase of property in partnership with William Cloutier that eventually was sold for $94,000.

Laliberte totals these figures and arrives at a net worth of roughly one million dollars of "legitimate" income. It is legitimate, according to Laliberte, because the transactions all were initiated prior to the earliest date that the government alleges drug trafficking by him.

Laliberte neglects to mention, however, that the government's affidavits *did* indicate that the William Cloutier with whom he purchased three of the four properties listed was involved in drug trafficking at the time the properties were purchased. Because Laliberte has failed to point to any

evidence indicating which of the two financed the purchase of these properties, or for that matter, what the mode of "financing" was,[5] we cannot count these as assets legitimately acquired by Laliberte. Moreover, Laliberte has failed to point to any evidence in the record indicating the source of the money used by him to conduct these transactions. According to the government's affidavits, Laliberte's adjusted gross income was $6,887.08 in 1979, and $23,450.00 in 1980. Given this $30,000 of reported gross income, we find it a shade difficult to understand how Laliberte was able to finance approximately one million dollars in "legitimate" transactions.[6] Consequently, we reject Laliberte's list of legitimate income sources as entirely unpersuasive.

We also reject Laliberte's implied argument that so long as he had *any* legitimate sources of income, no matter how insignificant in comparison to his expenditures, the government could not forfeit the defendant properties without showing a specific link between the properties and particular drug transactions. We recognize that courts typically list as a consideration the fact that a claimant had "no" legitimate source of income. We would be ignoring common sense, however, if we read this "no income" language literally. Laliberte's legitimate annual income of $27,690 was so trivial in comparison to his millions of dollars in expenditures that for all intents and purposes, he had no legitimate source of income.[7] In addition, the government introduced much more to show probable cause than simply a comparison of Laliberte's income with his expenditures. We

have reviewed this evidence already, and will not repeat it here. Suffice it to say that after examining the aggregate of facts, we find that the government overwhelmingly established reasonable grounds to believe that the defendant properties constituted the proceeds of drug trafficking activity by Laliberte.

We acknowledge the theoretical, albeit unlikely, possibility that Laliberte's $27,690 annual reported income may have been scrupulously saved and used in the purchase of some small portion of the defendant properties. Given the government's comprehensive and particularized showing of probable cause, however, the burden shifted to Laliberte to produce facts establishing such a claim. Laliberte did not do so. *Cf. United States v. $41,305.00*, 802 F.2d at 1345 (stating that once the government makes a showing of probable cause to support forfeiture, the burden shifts to the claimant and she must do more than simply show a possible legitimate source for the money).

## II. THE STRIKING OF LALIBERTE'S AFFIDAVIT

Laliberte's next challenge is to the district court's striking of an affidavit offered by him in opposition to the government's motion for summary judgment. Laliberte's affidavit disputed many of the facts relied on by the government in its summary judgment motion, prompting the government to withdraw its motion pending Laliberte's deposition. At his deposition, however, Laliberte invoked his fifth amendment privilege in response to all questions asked by the government concerning his involvement

---

5. Our skepticism about the mode of financing stems from the fact that the purchase price of two of these properties, including the 26.6 acres of land, was $1, and the seller of one was an established drug trafficking associate of Cloutier.

6. We recognize that an affidavit filed by Laliberte in opposition to summary judgment lists the source of the money as the sale of a $400,000 silver coin collection owned by his mother. Laliberte's affidavit, however, properly was disregarded by the district court due to Laliberte's refusal to answer questions about its contents at his deposition. *See infra.*

7. *United States v. Pole No. 3172*, 852 F.2d 636 (1st Cir.1988), and *United States v. One Parcel of Real Property Known as 6 Patricia Drive*, 705 F.Supp. 710 (D.R.I.1989), cited by appellant, are not to the contrary. In these cases, the properties sought to be forfeited either were conceivably within the financial grasp of the claimants' legitimate incomes or the government's evidence of drug trafficking was insufficiently solid, which is certainly not the situation with Laliberte. *See United States v. Pole No. 3172*, 852 F.2d at 639–41, 644–45; *United States v. 6 Patricia Drive*, 705 F.Supp. at 712–19.

in drug trafficking, the alleged sources of his income, and his alleged use of narcotics proceeds to purchase the defendant properties. Consequently, the government moved to strike Laliberte's affidavit, contending that Laliberte could not state his account of the "facts" when he wished (e.g., in the affidavit), and yet shield this account from scrutiny by invoking the fifth amendment at his deposition. The district court granted the motion to strike, and did not consider the statements in Laliberte's affidavit when it decided the motion for summary judgment.

Laliberte now raises a three-part challenge to the striking of his affidavit, contending: (1) that the court erred in holding that the filing of the affidavit required him to answer questions at his deposition; (2) that the court failed to accommodate sufficiently the fifth amendment dilemma he faced in being forced to defend his property at the risk of self-incrimination; and (3) that, in any event, the court erroneously failed to take into account his last-minute agreement to answer deposition questions, of which the court was notified by letter two days before it signed its memorandum granting summary judgment. We consider these arguments seriatim.

 We hold that the district court had ample authority to strike Laliberte's affidavit after he invoked the fifth amendment and refused to answer the government's deposition questions. It is well-accepted that a witness' direct testimony can be stricken if she invokes the fifth amendment on cross-examination to shield that testimony from scrutiny. *See, e.g., Lawson v. Murray*, 837 F.2d 653, 655–56 (4th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *Klein v. Harris*, 667 F.2d 274, 287–89 (2d Cir.1981); *see also McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971) ("It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination."); *Brown v. United States*, 356 U.S. 148, 155–56, 78 S.Ct. 622, 626–27,

2 L.Ed.2d 589 (1958). The power to strike is grounded in the principle that once a witness testifies, she may not invoke the fifth amendment privilege so as to shield that testimony from scrutiny. To allow her to do so would constitute " 'a positive invitation to mutilate the truth.' " *Lawson v. Murray*, 837 F.2d at 656 (quoting *Brown v. United States*, 356 U.S. at 156, 78 S.Ct. at 627).

Laliberte attempts to avoid the application of this principle by arguing first, that the filing of his affidavit occurred during an earlier stage of the judicial proceeding and should not have affected or been affected by his later deposition, and second, that the cases where a witness's statements have been stricken typically have involved a witness's refusal to answer questions on cross-examination after having given direct testimony, which is not the situation here. We disagree.

First, it is true that had Laliberte's affidavit been filed and his deposition taken in separate, distinct proceedings, neither would have affected the treatment of the other. *Cf. United States v. Johnson*, 488 F.2d 1206, 1210 (1st Cir.1973) (noting that any waiver of the fifth amendment privilege is limited to the particular proceeding in which the witness volunteers the testimony). Laliberte's deposition and the filing of his affidavit, however, were part of the same proceeding, and thus this limitation does not apply.

Second, the fact that an affidavit was involved rather than direct testimony has no meaningful significance. What matters is whether a testimonial statement was involved. This is defined as a voluntary statement made under oath in the context of the same judicial proceeding. *See Klein v. Harris*, 667 F.2d at 288. Affidavits are voluntary statements made under oath and thus constitute testimonial statements. *See E.F. Hutton & Co. v. Jupiter Development Corp.*, 91 F.R.D. 110, 117 n. 2 (S.D.N.Y.1981). Laliberte's reliance on *Kirane v. City of Lowell*, 622 F.Supp. 262 (D.Mass. 1985) in an attempt to argue the contrary is misplaced. In *Kirane*, the court stated that where an affidavit was filed to prove

those facts necessary to invoke the fifth amendment, no waiver of the fifth amendment privilege would be found. *See id.* at 265–66; *see also United States v. Doe*, 628 F.2d 694, 696 (1st Cir.1980). Laliberte's affidavit clearly was filed with the intent of doing much more than simply reciting those facts necessary to justify Laliberte's invocation of the fifth amendment. Consequently, the district court had ample authority to strike the affidavit once Laliberte shielded his account of the "facts" from scrutiny by invoking the fifth amendment at his deposition. *See United States v. Rylander*, 460 U.S. 752, 758, 103 S.Ct. 1548, 1553, 75 L.Ed.2d 521 (1983) (holding that the trial court properly disregarded a witness's *ex parte* affidavit and his direct testimony when the witness declined to submit to cross-examination).

■ Laliberte next contends that even if the district court had the power to strike his affidavit, it should not have done so without first doing its best to accommodate the fifth amendment dilemma he faced in having to choose whether to relinquish his property without a fight to avoid the risk of self-incrimination, or defend his property and risk self-incrimination. Specifically, Laliberte objects to the district court's denial of his motion to seal his affidavit statements and any deposition testimony so that they could not be used against him in other proceedings. Laliberte contends that the denial of the motion to seal violated the trial court's duty to accommodate his fifth amendment interests.

In *United States v. $250,000*, 808 F.2d at 901, we articulated the general principle that courts should strive to accommodate claimants' fifth amendment interests in forfeiture proceedings, stating:

> Even if the forfeiture would genuinely prejudice the claimant's fifth amendment rights, the court should not dismiss the forfeiture, but should seek alternative means of accommodating both the claimant's rights and the government's interest in the forfeiture.

*See also United States v. United States Currency*, 626 F.2d 11, 15–18 (6th Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1085–89 (5th Cir.1979). We specified no particular level or type of accommodation as required, but rather simply articulated the general principle.

The district court below *did* strive to accommodate Laliberte's fifth amendment dilemma. It entered a protective order prohibiting the use of Laliberte's deposition transcript, interrogatory answers and affidavit in any criminal proceeding brought against him by the United States Attorney for the District of Massachusetts, except in connection with perjury charges or for purposes of impeachment. Laliberte now contends that this accommodation was not sufficient because it left open the possibility that his statements could be used against him in proceedings in other jurisdictions, namely, New Hampshire. He argues that the court should instead have granted his motion to seal. We reject these arguments for the following reasons.

■ First, so long as a district court attempts to accommodate a claimant's fifth amendment interests, the nature and extent of accommodation should be left primarily to that court's discretion. *See United States v. United States Currency*, 626 F.2d at 16 (stating that the district court is in a better position to know what means will best accommodate all interests). Laliberte has not contended that the court below failed to act in good faith in striving to accommodate each party's interests, and we are averse to second-guessing the court's actions on appeal in the absence of any indication that it abused its discretion.

Second, our suspicion after reviewing the record is that Laliberte's current emphasis on his motion to seal is an argument that has been crafted largely for purposes of this appeal. Prior to filing his affidavit in the proceeding below, Laliberte agreed to the terms of the protective order that was entered by the district court in an effort to accommodate his fifth amendment interests. No motion to seal was made by Laliberte at that time. It was not until three months *after* his affidavit was submitted and two weeks *after* his deposition that

Laliberte filed a motion to seal. Moreover, we have found no indication in the record that Laliberte ever informed the court of his willingness to answer deposition questions if his motion to seal were granted. The motion to seal itself refers only to the sealing of the two Laliberte affidavits, the answers to interrogatories, and "any discovery [that] *Mrs. Laliberte* may, at some future date, provide to the Court." (Emphasis added). Consequently, Laliberte's implicit argument on appeal that he would have testified at his deposition had the district court "adequately" accommodated his fifth amendment interests by granting his motion to seal seems contrived.

Finally, even though Laliberte argues that the trial court's accommodation was not the *best* means of handling his dilemma, the fact that he still faced a dilemma does not persuade us that the trial court was required by the Constitution to do more. *See Arthurs v. Stern,* 560 F.2d 477, 479–80 (1st Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *Flint v. Mullen,* 499 F.2d 100, 105 (1st Cir.) ("The Constitution, however, does not require the state, in every case, to adopt what appear to be preferable procedures."), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974); *see also United States v. Rylander,* 460 U.S. at 758–59, 103 S.Ct. at 1553 (" 'That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.' ") (quoting *Williams v. Florida,* 399 U.S. 78, 83–84, 90 S.Ct. 1893, 1896–1897, 26 L.Ed.2d 446 (1970)). The court's protective order was a reasonable effort to address Laliberte's fifth amendment concerns and more than satisfied the requirements of the accommodation principle.

 Laliberte's final contention with respect to the striking of his affidavit is that the district court erroneously failed to take into account his last-minute agreement to answer deposition questions. Two days before the trial *judge signed the memorandum striking Laliberte's affidavit and granting summary judgment on the basis*

of the government's affidavits, Laliberte's counsel notified the court via a hand-delivered letter that Laliberte had changed his mind and now agreed to answer deposition questions. Laliberte argues on appeal that in light of this last-minute agreement, the district court should have delayed its ruling on the government's summary judgment motion. We disagree.

Laliberte's change of heart occurred five months after he filed his initial affidavit and ten weeks after he repeatedly invoked the fifth amendment at his deposition to refuse to answer any of the government's questions. The motivation for the sudden change of mind seems to have been Laliberte's realization that the court was not going to consider his affidavit in light of his refusal to answer deposition questions, and also was not going to accept the affidavit of his wife, Joanne Laliberte, filed shortly after the deposition in an apparent attempt to substitute for Laliberte's affidavit. Without either affidavit, Laliberte's chances of defeating summary judgment were negligible.

Laliberte's last-minute backpedaling on his longstanding refusal to be deposed is not enough to save his properties. In analogous situations involving requests for additional discovery time, we have required written, timely statements detailing the reasons for the failure to have conducted discovery earlier and explaining why additional discovery would uncover material information. *See Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 988 (1st Cir.1988); *Hebert v. Wicklund,* 744 F.2d 218, 220–22 (1st Cir. 1984). Moreover, a trial court's grant or denial of such requests for additional time typically is reviewed only for abuse of discretion. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985).

We can find no abuse of discretion here. Laliberte's sudden change of heart certainly was not timely. Our review of the record reveals that the summary judgment materials were complete with the filing of Joanne Laliberte's affidavit. The district court indicated to counsel that it would

decide the summary judgment motion upon receipt of this last affidavit. Yet Laliberte waited nearly two months after this date, until literally hours before the trial judge signed her final decision, before finally relenting and agreeing to be deposed. Moreover, Laliberte gave no explanation of why he had been unable to make this decision earlier. In these circumstances, we can find no error in the trial court's refusal to take into account Laliberte's last-minute change of heart.

## III. FRANKS HEARING

■ Laliberte next contends that the district court erred in denying his motion for an evidentiary hearing to test the good faith of certain assertions in the government's affidavits. In *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978), the Supreme Court articulated the requirements that must be met to obtain such a hearing:

> There is, of course, a presumption of validity with respect to [an] affidavit. . . . To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the . . . affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. *Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the . . . affidavit to support a finding of probable cause, no hearing is required.*

(Emphasis added) (footnote omitted). Material omissions by an affiant are sufficient to constitute the basis for a *Franks* hearing. *See United States v. Rumney*, 867 F.2d 714, 720 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989). A district court's determination, however, that the requisite showing has not been made will be overturned only if clearly erroneous. *See id.; United States v. Southard*, 700 F.2d 1, 10 (1st Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

■ Laliberte's argument in support of his claim for an evidentiary hearing rests on various material omissions, half-truths, and outright falsehoods that he alleges exist in the government's affidavits. Because we find his contentions to have little merit, we summarize his allegations only briefly.

Laliberte's alleged material omissions pertain to the government's failure to include in its affidavits the selling prices for certain properties acquired by Laliberte prior to 1982. As discussed earlier, Laliberte claims the profits from those real estate transactions as part of his legitimate income, and contends that the government sought misleadingly to hide these profits to buttress its argument that Laliberte lacked substantial sources of legitimate income. Distinct from these material omissions, Laliberte also argues that the affidavits contain a number of misleading half-truths. Specifically, Laliberte challenges the manner in which the government described the $270,000 worth of cars, boats and other equipment purchased by Laliberte. Laliberte does not deny that he bought these items; he argues that the government's affidavits misleadingly gave the impression that the items were purchased with cash, when in actuality, many of them were financed with loans and only "modest" down payments. Finally, Laliberte lists some outright falsehoods allegedly present in the affidavits. In particular, he disputes a statement in the Coons' affidavit that he and Cloutier were financial partners in the fitness center located on Property # 1. He also contends that the government over-

stated his American Express charges by $58,000 in an attempt to make it seem as if he had spent more than he actually had.

According to Laliberte, these misleading statements either constituted deliberate falsehoods or were made with reckless disregard for the truth, thereby satisfying the first requirement for obtaining a *Franks* hearing. In satisfaction of the second *Franks* requirement, Laliberte also argues that insufficient evidence of probable cause remains if we disregard the affidavits' deficient statements. As part of this second argument, Laliberte contends that we must disregard not only the affidavits' misleading statements but also certain confidential informant information that Laliberte argues was not supported by sufficient indicia of veracity or reliability. Disregarding this material, according to Laliberte, undermines the government's evidence of probable cause. We disagree.

First, we have doubts about Laliberte's argument that the affidavits contain deliberate falsehoods or statements made with reckless disregard for the truth. Although we have not described in detail all of Laliberte's claims of error, many of the alleged flaws in the affidavits appear to be innocent mistakes or, at most, negligent omissions.

We also have substantial reservations about Laliberte's challenge to the various confidential informants whose statements connecting Laliberte to drug trafficking activities were summarized in the government's affidavits. Several of these informants were described in the affidavits as having provided "substantiated information" to authorities in the past. Laliberte contends that such a description is insufficiently detailed to establish an informant's knowledge or reliability under the probable cause standard of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). We acknowledge that the government's proffered evidence of reliability was somewhat cursory. As we recently have stated, however, our duty under *Gates* is to look at the totality of the circumstances. *See United States v. Caggiano*, 899 F.2d 99, 103 (1st Cir.1990); *see also United*

*States v. Ciampa*, 793 F.2d 19, 22 (1st Cir.1986). Applying this perspective, we find it significant that the confidential informants' statements regarding Laliberte's drug trafficking activities were independently corroborated by the statements of Bernier and McCann, two drug traffickers who had contact with Laliberte's operation, and by the statements of DEA Agent Bennett, who met with Laliberte in an undercover capacity regarding the purchase of cocaine. *See United States v. Nocella*, 849 F.2d 33, 41 (1st Cir.1988) (finding an informant to be sufficiently reliable after noting that there was independent corroboration for much of the information that the informant had provided). Given this corroboration, it arguably was sufficient for the government simply to state that the informants had provided substantiated information in the past, without providing comprehensive details about the nature of the information. *See United States v. Watts*, 540 F.2d 1093, 1097–98 & n. 12 (D.C.Cir. 1976).

In any event, we need not finally decide these questions because it is clear that Laliberte has failed to meet the second requirement necessary to obtain a *Franks* hearing. Under the second requirement, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the ... affidavit to support a finding of probable cause, no hearing is required." *Franks v. Delaware*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85. That is precisely the situation that exists here. Even if we corrected all of the claimed material omissions, and disregarded the alleged falsehoods and the challenged statements of confidential informants, there still would exist more than enough evidence to establish probable cause. Specifically, there still would be evidence of Laliberte's massive expenditures, many made with bundles of loose cash; Laliberte still would have no legitimate source of income that could account for more than an insignificant fraction of these expenditures; and there still would be the statements of Bernier, McCann, and Agent Bennett linking Laliberte to extensive drug trafficking activity.

We find no error in the district court's denial of Laliberte's request for an evidentiary hearing. *See United States v. Rumney*, 867 F.2d at 720–21 (upholding the denial of a *Franks* hearing after determining that there still remained adequate probable cause even if all of the appellant's challenges were accepted); *United States v. Paradis*, 802 F.2d 553, 558 (1st Cir.1986) (same).

## IV. REMAINING ARGUMENTS

[13] Laliberte raises two additional arguments. First, Laliberte challenges the adequacy of the government's initial forfeiture complaint, arguing that it failed to state with sufficient particularity the circumstances from which the government's claim arose. We disagree. The complaint specifically incorporated the facts recited in the affidavit of DEA Agent Joseph Coons, which was *attached* to the complaint. This same affidavit was attached to the government's summary judgment motion and detailed virtually all of the evidence relied upon by the government to support its forfeiture claim. We already have comprehensively reviewed the contents of the affidavit in the context of our probable cause discussion, and will not repeat that discussion here. Instead, we simply observe that we have found this affidavit to state sufficient facts to justify a grant of summary judgment on the government's forfeiture claim. It follows that if the affidavit was sufficient to support actual forfeiture, it certainly stated the facts with adequate particularity to meet the requirements of the complaint stage. *Cf. United States v. Pole No. 3172*, 852 F.2d at 638 (stating that " 'a forfeiture complaint must allege sufficient facts to provide a reasonable belief that the property is subject to forfeiture' ") (quoting *United States v. $38,000.00 in United States Currency*, 816 F.2d 1538, 1548 (11th Cir.1987)).

[14] We reject Laliberte's contention that the filing of such an attached affidavit along with a complaint cannot cure pleading defects because the factual particularity must be in the complaint *itself*. We are unaware of any such formalistic requirement. The governing standard requires only that the facts be set forth with such particularity as to enable the claimant to commence an investigation and frame a responsive pleading. *See United States v. Pole No. 3172*, 852 F.2d at 638. Whether the facts are contained in the complaint itself or in an attached affidavit would seem irrelevant to this inquiry. *See United States v. Premises and Real Property at 4492 South Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir.1989) (explicitly rejecting a particularity challenge to a forfeiture complaint and holding that affidavits filed with the complaint cured any lack of particularity in the complaint itself); *cf. United States v. $38,000.00 in United States Currency*, 816 F.2d 1538, 1541 & n. 4, 1548 & n. 23 (11th Cir.1987) (examining an accompanying affidavit as part of a particularity inquiry); *United States v. 6 Patricia Drive*, 705 F.Supp. at 719 (same). We might decide differently if the affidavit were not attached to the complaint. *Cf. United States v. Pole No. 3172*, 852 F.2d at 640 (expressing reservations about the government's argument that an affidavit had been implicitly incorporated into the complaint). That, however, is not the situation presented here.

[15] Laliberte's final argument challenges the constitutionality of 21 U.S.C. § 881, contending that the statute is unconstitutionally vague because it does not provide a process for forfeiting real property. This is a "last straw" contention. The defendant real properties were forfeited under 21 U.S.C. § 881(a)(6) on the ground that they constituted the proceeds of drug trafficking activities. There can be no doubt that the language in 21 U.S.C. § 881(a)(6) providing for the forfeiture of "proceeds" encompasses such a forfeiture of real property. *See United States v. Premises Known as 8584 Old Brownsville Rd.*, 736 F.2d 1129, 1130–31 (6th Cir.1984); *United States v. 6 Patricia Drive*, 705 F.Supp. at 713–14. It is also clear that 21 U.S.C. § 881(d) explicitly specifies the procedures and burden-shifting rules of the customs laws, 19 U.S.C. § 1615, as governing forfeitures under § 881, including for-

feitures under § 881(a)(6). *See, e.g., United States v. $250,000,* 808 F.2d at 897. Moreover, courts in this circuit and elsewhere have repeatedly applied the burden-shifting procedures and rules of 19 U.S.C. § 1615 to the forfeiture of real property. *See, e.g., United States v. Parcel of Land and Residence Located Thereon at 5 Bell Rock Rd.,* 896 F.2d 605, 606 (1st Cir.1990); *United States v. South 23.19 Acres of Land,* 694 F.Supp. 1252, 1253–54 (E.D.La. 1988); *United States v. Premises Known as 2639 Meetinghouse Rd.,* 633 F.Supp. 979, 986–87 (E.D.Pa.1986); *see also United States v. A Parcel of Land with a Building Located Thereon at 40 Moon Hill Rd.,* 884 F.2d 41, 42–43 (1st Cir.1989) (upholding the forfeiture of real property pursuant to 21 U.S.C. § 881(a)(7)). Laliberte's argument of unconstitutional vagueness is without merit.

Even more meritless is Laliberte's argument that the allocation of burdens under 19 U.S.C. § 1615 is unconstitutional with respect to § 881 forfeitures. That argument has already been explicitly addressed and rejected by this circuit. *United States v. $250,000,* 808 F.2d at 900.

The judgment of the district court is

*Affirmed.*