**UNITED STATES of America, Plaintiff,**

**v.**

**REAL PROPERTY IN MECKLENBURG COUNTY, N.C., KNOWN AS LEOLA'S PLAZA, LOCATED AT 1501 WEST BOULEVARD, and Safety Deposit Box 148, Wilkinson Blvd., Office of First Citizens Bank, Defendants.**

No. C–C–89–344–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Jan. 21, 1993.

B. Frederic Williams, Asst. U.S. Atty., U.S. Dept. of Justice, Charlotte, NC, for plaintiff.

Kenneth P. Andresen, Caudle & Spears, David Williams, Hoover & Williams, and Robert C. Hord, Jr., Charlotte, NC, for defendants.

## ORDER

McMILLAN, District Judge.

The question before the court is whether to approve the Memorandum and Recommendation ("M & R") entered in this case by United States Magistrate Judge Paul B. Taylor.

Judge Taylor's M & R was filed on February 14, 1992 (Document # 76 in the court file).

In his M & R, Judge Taylor, an eminently diligent and capable magistrate judge, has summarized the facts, which are supported by the record, and has identified and described the evidence in the record which support his conclusions. The M & R is characteristically clear, thorough, factual and rational.

I doubt that any attempt by me to re-plow the same ground that Judge Taylor has already covered would do anything but add weight to the file.

This court hereby adopts Judge Taylor's summary of the case, including the facts he finds, and the conclusions, legal and otherwise, that he draws.

Upon those facts, the seizure and forfeiture of the property were abundantly justified and the decision of Judge Taylor should be affirmed in its entirety.

IT IS THEREFORE ORDERED:

1.  That all objections and requests for relief asserted by the defendant are OVER-RULED;

2.  That the Memorandum and Recommendation of the United States Magistrate Judge Paul B. Taylor is AFFIRMED in its entirety; and

3.  That the relief sought by the United States of America is ALLOWED.

The court is filing simultaneously herewith a Judgment of Forfeiture.

## JUDGMENT OF FORFEITURE

McMILLAN, District Judge.

THIS MATTER is before the Court upon Plaintiff's motion for summary judgment pursuant to Fed.R.Civ.P. 56 and the Magistrate Judge's Memorandum and Recommendation pursuant to 28 U.S.C. § 636(b), the Court finds that:

1.  The United States filed a verified complaint for forfeiture of defendant property; process was duly issued in this action after a finding of probable cause by the Magistrate Judge and defendant property was duly seized by the United States Marshal pursuant to said process; the Marshal served numerous persons, including all known to have or likely to claim an interest in defendant property, filed lis pendens, and published notice, fulfilling the requirements of relevant law;

2.  The United States and Claimant First Citizens Bank entered into a Consent Order in which that Claimant is acknowledged as the owner of a loan secured by a deed of trust on defendant property and which provides for a payment to this Claimant from the proceeds of any sale by the Marshal pursuant to a judgment of forfeiture;

3.  Leola Marsh filed a claim and answer, but no other person filed a claim or answer;

4.  The United States submitted a motion for summary judgment of forfeiture against Claimant Leola Marsh and this motion was supported by affidavit and other evidence which was sufficient to carry its burden to show probable cause for forfeiture; and

5.  The response of Claimant Marsh did not meet the requirements of Fed. R.Civ.P. 56(e) to raise a genuine issue of material fact and therefore the United States is entitled to judgment as a matter of law.

Based upon the above findings, IT IS, HEREBY, ORDERED, ADJUDGED AND DECREED that:

1.  Judgment is hereby entered against defendant property (as defined in paragraph 4(a) of the complaint herein, which includes specific reference to deeds on file in the Mecklenburg County Registry);

2.  All persons other than Claimant First Citizens Bank and Claimant Leola Marsh claiming any right, title, or interest in or to defendant property are hereby held in default;

3.  The claim of Claimant Marsh is hereby dismissed;

4.  Defendant property and all rights, title, and interest in or to defendant property are hereby forfeited to the Plaintiff, United States of America, and no other right, title, or interest shall exist therein except for that set forth in the Consent Order with First Citizens Bank as filed on November 22, 1991; and

5.  The United States Marshal is hereby directed to dispose of the forfeited defendant property as provided by law; and

6.  The counterclaims of Claimant Leola Marsh are hereby dismissed.

## MEMORANDUM AND RECOMMENDATION

TAYLOR, United States Magistrate Judge.

THIS MATTER is before the undersigned Magistrate Judge on reference from the District Court pursuant to 28 U.S.C. § 636(b). Currently pending are the government's motion for summary judgment (Pleadings 52,

53) supported by two volumes of documentary exhibits (49, 50), claimant Leola Marsh's response (62), the government's reply (66), Marsh's documentary submissions (65), the government's response to Marsh's documentary submissions (67), and two more filings by Claimant (68, 69). Having fully reviewed the extensive record in this case and the pertinent authorities and conducted several hearings, the undersigned herewith enters the following Memorandum and Recommendation.

■ This is a civil action for the forfeiture of Leola's Plaza, a strip shopping center on West Boulevard near the intersection of Remont Road in Charlotte, N.C. The property is currently assessed for real estate taxes at about $300,000. The forfeiture was based on probable cause to believe that the property was acquired from the drug money of Leroy Ragin, who is now serving 28 years for money laundering and operating a continuing criminal enterprise (CCE)[1] in Charlotte. His aunt, Leola Marsh, is the only remaining claimant.[2]

The procedural history is complex;[3] only that relevant to this memorandum will be described herein. The United States filed a verified complaint for the forfeiture of defendant property on August 31, 1989. The court reviewed the sworn statements of experienced FBI and IRS agents, found probable cause for the forfeiture, and issued a Warrant of Arrest *In Rem* for seizure of the property and for the Marshal to give lawful notice to potential claimants. It was seized on September 1, 1989, and proper notice to potential claimants was issued, personally and through newspaper publication and recording of lis pendens. All procedural requirements for forfeiture were completed.[4] Leola Marsh timely filed a claim and an answer.

Marsh was indicted by a grand jury in this district on charges of money laundering in connection with payments for defendant property. Several months later, the United States dismissed the charges against her in connection with Leroy Ragin's plea of guilty to counts of the same indictment charging him with money laundering and operating a CCE.

The United States filed a motion for summary judgment on August 26, 1991. The motion was supported by an exhaustive memorandum of about 100 pages and two volumes of documentary exhibits (including several affidavits and numerous documents produced by Marsh and her bank in response to discovery requests). Marsh filed a response on October 31, 1991,[5] but the response was not accompanied by any evidence. The United States filed a reply on November 7, 1991, which cited Supreme Court and numerous Fourth Circuit decisions to show that Marsh's response was inadequate under current standards for summary judgment. On the day before the hearing on the motion, Marsh filed a quantity of documents without explaining how they relate to any issue herein.[6] The Court and the United States learned of the filing of these documents at the hearing.

1. 21 U.S.C. § 848. Frequently referred to as the drug kingpin statute.

2. A stipulation has been filed between the United States and First Citizens Bank, which recognizes that bank's mortgage.

3. The procedural history is summarized at pp. 9–23 of the memorandum supporting the summary judgment motion of the United States. (Dkt. 53)

4. Pursuant to 21 U.S.C. § 881(d) and 18 U.S.C. § 981(d), relevant procedural laws are found at 19 U.S.C. §§ 1602 *et seq.* and the Supp. Rules for Certain Admiralty and Maritime Claims.

5. On October 10, 1991, the United States moved for entry of judgment, since no response had been received, even though it was 45 days overdue under the pretrial order; on October 21, claimant asked for and received an extension until October 31 to respond.

6. The United States filed a motion shortly after the hearing requesting the documents be disregarded as untimely under the pre-trial order, as extended per her request. The motion noted the affidavit of Marsh's counsel violated the rule that an attorney cannot be a witness where he is also counsel. The Court agrees with the last argument, and has excluded the attorney's affidavit from consideration. It is unnecessary to reach the other question, since a careful review of the other documents did not raise a genuine issue of fact material to the conclusions and recommendations herein.

The United States has met its burden to show probable cause, but Marsh's response to the motion for summary judgment has not met her burden to come forward with affirmative evidence raising a genuine issue of fact, which if proved, would prevent forfeiture. Therefore the United States is entitled to summary judgment as a matter of law.

## BURDENS ON THE PARTIES

■ The United States is entitled to forfeiture on a finding of probable cause unless the claimant proves a defense to forfeiture by a preponderance of the evidence. *United States v. $95,945.18*, 913 F.2d 1106, 1110 (4th Cir.1990); *United States v. One Parcel at 7715 Betsy Bruce Lane*, 906 F.2d 110 (4th Cir.1990); *Boas v. Smith*, 786 F.2d 605, 609 (4th Cir.1986).

These burdens on the parties apply in determinations of motions for summary judgment.[7] Fed.R.Civ.P. 56(e) requires:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.* If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(Emphasis added.) The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Advisory Committee Note to 1963 Amendment to Rule 56(e)). *Matsushita* is one of three 1986 cases in which the Supreme Court expanded authority for summary judgment and "made increasingly clear ... the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).[8]

Summary judgment requires the court to "perform a dual inquiry into the *genuiness* and *materiality* of any purported factual issues." *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985) (Emphasis in original).

■ Conclusory assertions and mere denials do not raise *genuine* issues of fact, and thereby cannot prevent summary judgment, even if in the form of an affidavit. A party opposing summary judgment "must present affirmative evidence," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), and may not rely on affidavits with only "conclusory allegations," *Ballinger v. North Carolina Agr. Extension Service*, 815 F.2d 1001, 1004 (4th Cir.1987). Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695, 715–16 (1990) (citing *Anderson*). Summary judgment will be granted if "[t]he entire content of the affidavit is conclusory, it does not set forth facts of which the plaintiff has personal knowledge and it does not give specific facts, but only generalities." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984). Of course, "[t]he arguments of counsel, absent any evidence such as sworn affidavits ... fail to

---

**7.** Both *$95,945* and *Boas* are summary judgment decisions.

**8.** *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court repudiated the former hostility to summary judgment which

had required denial on "the slightest doubt" and encouraged use of Rule 56, even when there are factual disputes. Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 183 (1987); Comment, *Summary Judgment: The Majority View Undergoes A Complete Reversal in the 1986 Supreme Court*, 37 Emory L.J. 171 (Winter 1988).

meet the evidentiary standard necessary to create a genuine issue of material fact." *Rountree v. Fairfax County School Bd.*, 933 F.2d 219, 223 (4th Cir.1991).

█ To be material, a genuine fact issue must relate to facts which if proved would as a matter of law enable the party opposing summary judgment to prevail on the merits of the case. In the forfeiture context, therefore, this requires the claimant to produce affirmative evidence that would, under substantive forfeiture law, defeat forfeiture.

The Fourth Circuit affirmed *United States v. Miscellaneous Jewelry*, 667 F.Supp. 232 (D.Md.1987), which held that the government's burden of proof in a motion for summary judgment in a forfeiture case is probable cause, 667 F.Supp. at 235 n. 5, 237–238, and then the burden shifts to the claimant to respond with affidavits or other evidence to prove the defendant property is not proceeds of exchanges for drugs or any other defense to forfeiture by a preponderance of the evidence, *id.* 240–241. *In re One 1985 Nissan*, 889 F.2d 1317 (4th Cir.1989) *(en banc).*

Thus there are two questions to be answered herein: first, whether the United States has shown probable cause for forfeiture, and second, whether claimant has met her burden under Fed.R.Civ.P. 56(e) to raise, through affidavit and other admissible evidence, a genuine issue of material fact.

### 1. HAS THE UNITED STATES SHOWN PROBABLE CAUSE?

█ "[T]he definition of probable cause applicable here is the same as that which applies elsewhere: 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" *United States v. $95,945.18*, 913 F.2d 1106, 1110 (4th Cir.1990). Probable cause is to be determined by "the totality-of-the-circumstances." *Illinois v. Gates*, 462 U.S. 213,

233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). No conviction is necessary for forfeiture,[9] and probable cause may be based on circumstantial evidence and hearsay. *United States v. 7715 Betsy Bruce Lane*, 906 F.2d 110 (4th Cir.1990).

█ The United States's summary judgment motion is supported by extensive evidence showing probable cause to believe Ragin provided the funding for the property. Since there is so much evidence[10] supporting probable cause for forfeiture, this memorandum will not rely on any allegation in the government's summary judgment materials which Marsh has properly controverted under Fed.R.Civ.P. 56(e).

Marsh has not disputed that the litigation was begun by an independent judicial finding of probable cause prior to issuance of the original seizure warrant and that the grand jury indicted her, Leroy Ragin, and Graham Davis[11] for "conducting and attempting to conduct" money laundering transactions:

> the payment of approximately $90,000.00 in construction funds in the form of United States Currency and checks, which in fact involved the proceeds of ... dealing in cocaine ... knowing that the property involved in the said financial transactions ... concerning the construction of Leola's Plaza ... represented the proceeds of some form of unlawful activity, and ... [knowing] that the financial transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity.[12]

*See* 18 U.S.C. § 1956(a)(1)(B)(i). ·

It is undisputed that Leroy Ragin was convicted of engaging in a continuing criminal enterprise and money laundering and is

---

9. In *Nissan,* every member of the Fourth Circuit agreed with the forfeiture of White's entire estate worth more than $1,500,000 when the government apparently could not prove he ever engaged in any particular drug transaction.

10. Pages 23–56 of the memorandum supporting the summary judgment motion of the United States (Dkt. 53) provide a detailed summary of evidence supporting probable cause.

11. Davis was obviously an important participant in the transactions at issue herein, but died prior to trial.

12. Although this indictment was later dismissed pursuant to Leroy Ragin's plea, it was a finding of probable cause.

now serving 28 years without parole. Ragin spent 1972 to 1986 in federal prison or on probation pursuant to a ten-year sentence by the Honorable James B. McMillan.[13] Starting in the mid–1970s, he was a large-scale drug dealer in Charlotte; he went to Florida to buy kilogram quantities of cocaine as early as 1976; in the mid–1980s he was grossing $1,000,000 a year and making $25,000 a week profit, and by 1988–89, he was grossing over $3,000,000.

During his Rule 11 and sentencing hearings, Ragin admitted unlawfully selling drugs and laundering the proceeds through several properties. At his Rule 11 hearing, for instance, he said that, "I'm pleading guilty because I did it, and I did it with them [his co-defendants, including Marsh]; but they didn't know where that money came from."

At sentencing, the United States offered hearsay testimony from the lead investigator that Ragin had invested $90,000 or more of drug proceeds into Leola's Plaza.[14] After hearing this testimony and just prior to sentencing, Ragin said that the agent had "done a very thorough investigation because the things that he said were right there ..." and acknowledged that the $1.4 million in seized property had been obtained from his drug profits, but the testimony had exaggerated those profits since he still owed over $600,-000.00 on them.[15] The seized property consists primarily of Westover Shopping Center and Leola's Plaza.

Marsh does not dispute that Ragin used family members and sham corporations as nominees or that he stated that the activities for which he had received 28 years had enabled him to support his family in a manner which he would otherwise have been unable to do.

Marsh does not contest the fact that Ragin signed changes to the construction contract for Leola's Plaza, showing he was considered a party to the contract. It is also uncontested that Ragin's confederates, including Graham Davis and Belton Platt, made the construction site for Leola's Plaza an armed camp, chased off the original contractor, and left Davis in charge.

During discovery, Marsh produced documentation of a $75,000 loan for the construction of Leola's Plaza from W & D Diversified Services and Graham Davis. W & D and Davis assisted Ragin in his acquisition of assets involved in this and related forfeiture actions, including Carrie's Kitchen[16] and Westover Shopping Center.[17] She has not, however, produced a written contract for this loan, a schedule of repayment, or a recorded lien. It is highly unusual to build a shopping center without documentation of the financing arrangements, and this absence provides additional support for probable cause. Her current position appears to be that she did

---

**13.** C–CR–72–121. He was released twice on probation and returned to prison for drug dealing and other violations.

**14.** Although not critical to this recommendation, there is further hearsay evidence from several agents that Hubert H. Ragin, Leroy Ragin's uncle and the father of Hubert L. Ragin (who is now serving 6 years on federal drug charges), told them that Leroy Ragin admitted to him that Leroy Ragin was going to build Leola's Plaza. Marsh attempts to rebut this allegation through an affidavit filed by her attorney, which relates a telephone conversation he had with Hubert Ragin. An affidavit of counsel for a party is not competent evidence to raise a material issue of fact. Accordingly, the agents' affidavit about Hubert H. Ragin's original statements remains unchallenged.

**15.** Plus: "I sold kilos of cocaine for $20,000 and $25,000," and the agent "left out a small part, if it cost $17,000 and you sold it for $20,000, you didn't make $25,000, you made $3000."

**16.** C–C–89–343–M. Ragin used this restaurant, under a prior name, as a front for drug sales. The owners of the realty rented it to Ragin's sham corporation, Errie, Inc., after Davis, using W & D stationery, claimed that Errie owned a shopping center valued at $225,000 in 1986, and that during that year he was a "Consultant to and assisted in financing an investor for the purpose of building a shopping center in Charlotte, North Carolina valued at $225,000."

**17.** Davis negotiated the purchase of this property for $1,000,000 in the name of Errie, Inc. Ragin made nearly $600,000 in payments on it, over half of which in the form of grocery bags full of small bills, and it has already been forfeited pursuant to an order of Judge Potter. Ragin's only defense was that a Nigerian company had provided him with a million dollars for investments. He provided no documentation of this funding.

not receive the loan, yet she has submitted no affidavit or other evidence contradicting the truth of these documents or tending to prove either that the $75,000 was not provided or that it was clean money.

After receiving two urgently demanded hearings a year apart on her motions relating to deposing the general contractor (McLendon), Marsh neither deposed him nor provided an affidavit from him as to why Ragin signed the contracts, about what the actual costs were, who was to pay, and whether Davis or Ragin actually paid him anything.[18] Similarly, she demanded a hearing on her motion to compel Ragin to answer questions at a deposition a week before his trial on CCE, when he said "when my trial comes out, all these questions will be answered" but asserted his right to remain silent until that time.[19] Yet she never noticed his deposition even after he had pled guilty and presumably had no further reason to assert his right to silence.

Marsh produced receipts and other documentation showing that W & D and Davis made $99,000 in payments on the construction, but now appears to argue that the payments were not made. Yet she produces no evidence these documents are fabrications. If she implies that work was done from May until November, 1986, without progress payments to the contractors, she has produced no evidence of this at least implausible assertion.[20]

In addition, Marsh concedes Davis made direct payments to subcontractors and she had no contact with them. She finds it significant that the payments were made by check on W & D's account rather than in cash, but never produces evidence to refute

the probable cause to believe that Davis and W & D were a conduit for Leroy Ragin's drug money, whether or not checks were used.

It is undisputed that Leola Marsh, who is Leroy Ragin's aunt, has had insufficient income or assets to finance Leola's Plaza. On $2,700 a year, she could not finance any meaningful part of the substantial costs of this shopping center.

Marsh does not contest the fact that her tax returns report adjusted gross income for 1986, the year the shopping center was built, and the five preceding years, totalling $16,215 or an average of $2,703 per year, even though she also claimed an aunt as a dependent. Her tax returns, loan applications, and financial statements do not reflect the existence of any savings or non-taxable income. In response to an interrogatory question, she said she spent $1,500 per month ($18,000 per year) on "basic living expenses" during 1977 to 1991. She has contested neither the allegations that she does not live a frugal lifestyle and "loves money" nor the facts that she drives a Mercedes Benz, buys expensive clothing, and ate out at restaurants during most of the relevant period.

Marsh has not disputed that when she was interviewed just prior to seizure in 1989, she had not filed any tax return since the return for 1983. Just a few weeks before, however, she had submitted a loan application to her bank which was supported by copies of what she represented to be the tax returns she filed for 1987 and 1988. Shortly after seizure, she filed different returns for these years with the IRS. These returns are inconsistent on income, business expenses, rent from defendant property, cost of defendant

---

**18.** Apparently she relies on the statements in the United States's summary judgment materials which report that the general contractor disavows receiving more than $30,000. Hearsay reports of these statements support probable cause; Marsh, however, cannot meet her burden with hearsay. Note that the evidence used to connect White to drug dealing in *Nissan* derived from hearsay from unidentified "reliable confidential sources" that was corroborated by further investigation. 667 F.Supp. at 238. Yet his personal representative was "unable to carry [claimant's] burden" because "he has no personal knowledge concerning White's business activities, legal or

illegal, his sources of income or how he acquired any of the defendant properties." *Id.* at 240.

**19.** Transcript attached to Marsh's motion to compel, Dkt. 38, filed June 4, 1990, at 5, 7.

**20.** A valuable building got built. It stretches the imagination that no one paid anything but upfitting expenses. *See Matsushita, supra:* where the factual context makes claims implausible, the party must produce more persuasive evidence than would otherwise be necessary to prevent summary judgment.

property, number of dependents, and tax due. She has submitted no affidavit, documents, or even arguments as to why these inconsistent returns were filed.

Marsh has also not contested the fact that the returns submitted to the bank represented that she had paid $171,375 for depreciable improvements on the property while those sent to IRS said she had paid $131,254. Her daughter, Edith Saxton, who is a CPA and Marsh's return preparer,[21] admitted under oath that Marsh had only paid about $21,000. Saxton stated that Graham Davis was the likely source of some unidentified deposits to Marsh's bank account that she lists as "loans" and that this money was probably intended for, but never paid to, the builders of the shopping center. Marsh has produced no evidence contesting the accuracy of Saxton's statements.

Marsh has not disputed that her bank records document her receipt of at least $44,612 in unusual amounts of currency and amounts from persons associated with Leroy Ragin's drug and money laundering activities during the year after the start of construction. She made large currency deposits totalling $35,768, deposited checks from Davis, W & D, and Sandra Ragin[22] totalling $3,500,[23] and received a wire transfer of $4,344 to Marsh's account from a firm related to W & D.[24] Not only has she not challenged the accuracy of the bank records and the

summary provided in the summary judgment memorandum and exhibits, she does not contest the facts and expert opinion in the IRS agent's affidavit that "[c]urrency deposits of several thousand dollars at a time are unusual in a beauty salon business and MARSH did not include them in her income for 1986 and 1987" and that Marsh's banker said that "most of MARSH'S regular business deposits consisted of rent checks and checks from customers."[25]

There is substantial and undisputed evidence supporting probable cause to believe the Leola's Plaza cost a significant amount of money. Marsh represented to her bank that the improvements cost her $171,375. Her insurance company and the Mecklenburg tax assessor valued them respectively at $270,000 and $228,270 at completion. Her bank's valuation of the property as security for a loan agreed with the tax assessor. Building permits totaled $177,000. An appraisal done by the Marshal as part of his custodial responsibilities for the Court found the normal cost would be $278,000.[26]

*Conclusion.*

There is clear evidence that at least $75,000 in Ragin's drug money was used to acquire the property, Ragin signed the construction contract, Ragin's drug conspirators made the construction site an armed camp, Davis supervised construction, and Marsh

---

**21.** She admits primary responsibility for Marsh's bookkeeping, financial statements, and tax returns. Saxton's phone number was one of the few Ragin had with him when he was arrested in 1989 with three kilograms of cocaine, and appraisal documents for her house were found in Ragin's house when it was searched.

**22.** Sandra Ragin is Leroy Ragin's sister. She was a co-owner with Davis of the restaurant known as Carrie's Kitchen when seized in C–C–89–343–M. Leroy Ragin used it as a front for drugs.

**23.** Each of these checks was deposited at the same time as a large currency deposit ($1,800 check from Davis deposited with $4,100 in currency; $1,000 check from Sandra Ragin with $3,500 in currency; $700 check from W & D with $1,400 in currency).

**24.** The firm is at the same address as W & D, Davis is an authorized signature on the account

the wire was drawn from, and the wire request was signed by an associate of both Ragin and Davis (e.g. he, Davis, and Ragin are three of the four directors in Ragin's sham corporation that Davis and Ragin used to purchase Westover Shopping Center). See Exhibits 26–L, 31.

**25.** Exhibit 26 at 13.

**26.** Among the materials she submitted just before the summary judgment hearing was a document which appears to be an appraisal of Leola's Plaza. It states without source that the "building was erected during 1986 at an approximate cost of $150,000," p. 12, and provides a valuation of $188,100 by the cost approach based on "current cost data to build a similar building" of $181,880, site improvements of $11,700, minus depreciation of $72,752, plus $67,300 land value. Even if this unauthenticated document is admissible under Rule 56(e), it does not to raise a genuine issue since it supports the facts that the property cost a significant amount and was more than Marsh could afford.

has produced almost none of the normal documentation for the construction and financing of a shopping center. While largely circumstantial, this evidence shows probable cause to believe the property is proceeds of drug dealing and involved in money laundering violations, and thereby forfeitable under 21 U.S.C. §§ 881(a)(6), 881(a)(7), and 18 U.S.C. § 981.

Marsh's tax returns show she did not have enough legitimate income to finance the acquisition of the property, and this is more than adequate evidence to show probable cause pursuant to a net worth theory.[27] The Fourth Circuit's recent *en banc* decision, *In re One 1985 Nissan, supra* assumes the net worth theory. The court granted forfeiture of substantial assets based on confidential informant information regarding the putative owner's drug dealing, surveillance and informant information indicating he did not have legitimate employment or income, and evidence of some non-drug income.[28] His obviously innocent infant heirs were unable to prove that he had had sufficient legitimate income to acquire his assets. *See also $95,-945,* 913 F.2d at 1111 (claimant "has not explained adequately how someone with his income came to have almost $100,000 . . ."); *United States v. Thomas,* 913 F.2d 1111, 1114–15 (4th Cir.1990).

Therefore, the answer to the first question is that the United States has shown probable cause to believe the property is proceeds of drug dealing, thereby forfeitable under 21 U.S.C. §§ 881(a)(6) and (a)(7), and that it was involved in money laundering violations, thereby forfeitable under 18 U.S.C. § 981.

## 2. HAS MARSH MET HER BURDEN TO PROVE A DEFENSE?

▋ Since the United States has shown probable cause, the property must be forfeited unless Marsh has met her burden to produce affirmative evidence to prove a defense.[29] Her response to the motion for summary judgment is in two parts: the first consists of argument unsupported by evidence, and the second consists of documents without arguments showing their relevance.

The significance of her submissions is more in what they do not do than the immaterial things they attempt to do. As stated in the previous section, Marsh has provided no evidence disputing numerous facts which are relied upon to show probable cause. She has simply ignored most of these facts.

Marsh's response to the motion for summary judgment, her submission of documents just prior to the hearing, and her argument at the hearing did not provide an explanation of how she acquired the property with legitimate income, or why there were so many indications that Leroy Ragin had funded its acquisition.

She never disproves or explains Ragin's statements that he funded the property, his signature on the construction contracts, or allegations regarding confederates who made the construction site an armed camp. She has failed to refute or explain the documents showing a $75,000 loan and $99,000 in payments from W & D and Davis. She provides the affidavit testimony of none of the contractors as to what they were paid, by whom, and who they dealt with; and if they were not paid, why they worked without payment and how they tried to get paid.

Nowhere does her response explain how she could spend $18,000 a year on basic living expenses and pay for the property with a $2,700 annual income. She provides no evidence she ever had more income. She does not provide the total cost of the property, information regarding who made what payments on this property, or any evidence to trace such payments to legitimate income.

---

**27.** This compares claimant's known expenditures to legitimate income during the period in which that property was acquired, "and, in the absence of any explanation by the defendant which is reasonable susceptible of being checked, presumes that excess expenditures are from illegitimate sources." *United States v. Nelson,* 851 F.2d 976, 980–981 (7th Cir.1988).

**28.** These included the operation of a small grocery store and sale of merchandise from the back of a truck, 667 F.Supp. at 239, n. 12, and some import/export activity, at 240.

**29.** *See e.g. United States v. B & M Used Cars,* 860 F.2d 121, 125 (4th Cir.1988) ("forfeiture under 21 U.S.C. § 881 requires only unrebutted probable cause to believe that property was obtained in violation of statute.")

Marsh does present some documents to support the claim that she invested money in the building, although not the $171,375 she told her bank or the $131,254 she claimed on her tax returns. The documents she presents amount to about $21,000 in what she alleges to be building costs incurred just before moving into the property. But she has not disputed that these records relate to finishing, decorative, and "upfitting" work [30] rather than construction.[31]

More fundamentally, Marsh has neither disputed the evidence summarized above that large, unusual cash deposits were associated with the $21,000 in payments nor produced evidence tracing the payments from untainted sources. These deposits support probable cause to believe the deposits and thus the payments were derived from drug proceeds. *$95,945*, 913 F.2d at 1111.[32] She submits a conclusory affidavit from Saxton which says that relatives provided loans of unspecified amounts, dates, and terms, but provides no documentation of these loans, statements from the relatives,[33] or records tracing the payments through the banking system. She does not dispute Saxton's statements that at least some of about $30,000 in unidentified deposits had come from Davis to fund construction expenses.

Marsh also presents evidence that tenants made certain payments relating to completion of the building, but does not dispute the evidence that these payments and her own were just for "up-fitting." One of the tenants was Saxton, and Marsh does not dispute Saxton's admission that nearly all of Saxton's claimed expenses were for restaurant equipment installed in the premises rather than construction.

Finally, Marsh has produced some records relating to payments for the unimproved land in 1977 and 1983. She does not, however, dispute the agent's affidavit that these records relate to only $12,100 in payments or that the documents show purchase prices of $27,000 and required payments of principal and interest over a number of years. She also does not dispute that Ragin had substantial drug income since at least 1976. She provides no evidence her income was higher in the years prior to those in which she had only $2,700 a year for herself and a dependent. Yet she says she spent $18,000 a year on basic living expenses during each of the years from 1977 to 1991. She apparently attempts to rely on an affidavit from one of the recipients of the payments, who does not claim to have direct knowledge of where Marsh got the money,[34] but only that the affiant has no "reason to believe that any of the monies which Ms. Marsh used to pay for the parcels ... consisted of the proceeds from illegal substances." Marsh provides no affidavit of her own, and produces no evidence to carry her burden to prove the land was paid for with untainted funds.

These assertions, or even evidence, of her payment of some costs of construction or upfitting, tenant payments for similar expenses, and her purchase of the land do not raise a genuine issue of material fact. None of the evidence is inconsistent with the showing of probable cause that the property was acquired with drug money. Given the most favorable construction, the evidence might be found to show a possibility the property was not completely acquired with drug money. But a possibility is not enough to carry her

**30.** Expenses which are frequently made by commercial tenants to adapt and decorate the space to the needs of their business.

**31.** None relate to such fundamental building work as the reinforced concrete foundation, structural steel frame, masonry walls, glass store fronts, glass front doors, steel rear doors, steel roof system, tar and gravel roofing, and heating and air conditioning units and distribution and control systems.

**32.** Relying on *United States v. $2,500*, 689 F.2d 10, 16 (2d Cir.1982) ("$2,500 in cash 'is substantially greater than is commonly kept in residen-

tial premises by law-abiding wage earners' "), *cert. denied sub nom. Aponte v. United States*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984). *See also United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir.1990) (same holding, also relying on *$2,500*).

**33.** Saxton says that she loaned her mother money for the construction, yet Marsh loan applications show that Saxton owed her money and that she did not owe money to relatives.

**34.** Rule 56(e) "affidavits ... shall show affirmatively that the affiant is competent to testify to the matters stated therein."

burden.[35] When the United States has shown probable cause to believe property is the proceeds, in whole or significant part, of drug dealing, the claimant has the burden to prove a legitimate source of income, that this source is adequate for normal living expenses plus acquisition of the assets, and then trace the untainted income to the assets.[36] Marsh has submitted no such evidence.

█ Finally, even though not necessary to the conclusions and recommendations herein, it is noteworthy that even if she had carried her burden to prove that the $21,000 was for building costs and had traced the payments to untainted funds, this would not save $21,000 of the value of property being forfeited on a money laundering facilitation theory.[37] "The term 'facilitate,' implies that the property need only make the prohibited conduct 'less difficult' or 'more or less free from obstruction or hindrance.'" *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir.1990). When drug money is hidden by using it to pay for construction of a valuable building on land, the land is involved in and facilitates this laundering of drug money.[38] At least $75,000 in drug money was used for the construction of Leola's Plaza, involving the

**35.** In *$95,945* Baxter showed possible sources; to avoid summary judgment, Marsh must produce evidence which shows a "probability" and not a mere "possibility." *Whalen v. Roanoke County Bd. of Sup'rs*, 769 F.2d 221, 227 (dissenting opinion of J. Ervin, adopted as opinion of the court at 797 F.2d 170, 171 (4th Cir.1986) (*en banc*). "[C]laimant must do more than show the existence of possible legitimate sources of cash" and must produce bank records and establish all financial transactions since receipt of the legitimate money. *United States v. $41,305*, 802 F.2d 1339, 1345 (11th Cir.1986); *United States v. Parcels of Land*, 903 F.2d 36, 42 (1st Cir.1990).

**36.** *$41,305, supra* (claimant proved receipt of untainted money—nearly twice the amount seized—only a few months before seizure, but this did not carry her burden since she did not "offer her bank records … [or evidence] of the handling of that check" to prove it was the source of the seized money); *Parcels of Land, supra* (substantial legitimate income does not disprove probable cause or require the government to prove a specific link between drug transactions and the property to be forfeited); *United States v. One Parcel of Real Property*, 921 F.2d 370, 377, 375 (1st Cir.1990) (the government need not exclude other plausible sources of funds; fact some purchase money was not tainted does not insulate the property from forfeiture as proceeds since probable cause shifts the burden to claimant to prove what if any proportion is not traceable as proceeds); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1161 (2d Cir.1986) (the claimant must bear "the risk of uncertainty in determining the traceability of proceeds of drug sales …"); *United States v. $10,755*, 523 F.Supp. 447 (D.Md.1981) (claimant must prove the existence of legitimate income, the untainted funds "had been kept segregated from [tainted] money," and were used to purchase the asset); *United States v. $46,559*, 758 F.Supp. 613, 615 (D.Or.1990) (claimant must prove chain of custody over currency to carry its burden to prove that the seized currency was in

fact the currency legitimately owned). *Cf. Nissan*, 889 F.2d at 1319 and 667 F.Supp. at 240 (the alleged drug dealer left no records to segregate tainted from untainted income and assets, so it was impossible for his estate to carry its burden of proof).

**37.** 18 U.S.C. § 981(a)(1)(A) allows forfeiture of all property "involved in" a money laundering transaction, and Congress intended "property involved in" to include the corpus or funds laundered, any fees earned for the money laundering, and all property facilitating the money laundering activities. *United States v. All Monies (477,048.62)*, 754 F.Supp. 1467, 1473 (D.Haw.1991), citing 134 Cong.Rec. S17365 (daily ed. Nov. 10, 1988).

**38.** *United States v. Land and Building at 2 Burditt Street*, 924 F.2d 383, 385 (1st Cir.1991) (improvements to property not funded with proceeds were forfeitable with the property, since made after property became tainted); *All Monies (477,048.62), supra* (untainted money in account facilitated the hiding of drug money in account, therefore all was forfeited); *United States v. One Lot Jewelry, One 1987 Mercedes Benz*, 749 F.Supp. 118, 123 (W.D.N.C.1990) (Judge Potter holding that jewelry used to enhance drug dealer's status in the drug community is a basis for forfeiture as facilitation under 21 U.S.C. § 881); *United States v. South Side Finance, Inc.*, 755 F.Supp. 791, 798–799 (N.D.Ill.1991) (corporation, offices, equipment, and inventory of cars forfeited under § 981 on ground drugs were sold on premises, the money was laundered there, and the assets were involved in the money laundering); *United States v. Rivera*, 884 F.2d 544 (11th Cir.1989) (drug dealer operated horse ranch, conducted drug business from the ranch, used horse related terms in his code for drug conversations over the phone: the horses were properly forfeited for facilitating the drug dealing by contributing to the cover provided by the horse farm for the drug business), *reh. den. en banc*, 889 F.2d 276, *cert. den.* 494 U.S. 1018, 110 S.Ct. 1322, 108 L.Ed.2d 497 (1990).

whole property in the laundering violations.[39]

Marsh's response to the motion for summary judgment is quite like that of Baxter in *United States v. $95,945.18,* 727 F.Supp. 242 (W.D.N.C.1989), *aff'd,* 913 F.2d 1106 (4th Cir. 1990), and of Sharif in *Knight v. Sharif,* 875 F.2d 516 (5th Cir.1989).

In *95,945,* Baxter made general denials, attempted to discredit some of the evidence constituting probable cause, and submitted signed statements from persons who had allegedly made loans providing the source for the property. The Fourth Circuit held that he could not rest on mere allegations or denials, but must come forward with specific facts. 913 F.2d at 1111 (citing to *Anderson v. Liberty Lobby, supra*).

The court upheld Judge Potter's judgment that signed statements from persons who said they had lent Baxter $65,000 and a sworn statement of Baxter's father that Baxter had removed $17,000 from the father's apartment raised no genuine issue of material fact as to whether Baxter was the legitimate owner of the currency. 727 F.Supp. at 245; 913 F.2d at 1111, n. 8. Saxton's conclusory affidavit says that family members made unspecified loans, but Marsh does not even present unsworn statements from the family members, much less their affidavits.

The Fourth Circuit also upheld Judge Potter's finding that Baxter had insufficient income to have acquired the $95,545, 913 F.2d at 1111, 727 F.Supp. at 245, but Baxter reported more income on the three tax returns he produced than Marsh did on the six she produced.[40] *This evidence did not prevent summary judgment of forfeiture of all the* $95,545. Marsh's submissions are insufficient to prevent forfeiture of the $300,000 shopping center.

In *Sharif,* the Fifth Circuit granted summary judgment against him because:

> While Sharif argues vociferously, he submits no additional facts, nor does Sharif provide a plausible interpretation [of the evidence submitted by the moving party, ... which has] put before the Court a full and adequately supported chronology of the facts ... Sharif presents no reasons for contesting these facts or any factual support for such a contest.

*Id.* at 523. Similarly, Marsh does not provide any coherent theory of how the undisputed facts can be reconciled with her untainted ownership of the property. Her response to the summary judgment motion criticizes the United States for having a theory of the facts and avoids propounding one of her own. The United States provides evidence of several different stories she and Saxton have given at various times, and its summary judgment memorandum points out numerous inconsistencies among their oral and documented statements. Marsh's response does not refute the conclusions of the agent's summary affidavit[41] and the summary judgment memorandum[42] that Marsh does not appear constrained by the validity of her assertions.

*Conclusion.*

The United States has provided extensive and detailed evidence, and its interpretation is persuasive. Marsh contests almost none

---

**39.** Note that in the companion Westover Shopping Center case, Judge Potter held that Ragin's plea of guilty to making one $25,000 payment for this property with drug money under a contract in which he was buying it for $1,000,000 collaterally estopped him from contesting forfeiture of any of its value since the one payment made the whole property forfeitable because of its involvement in that one money laundering violation.

**40.** Baxter made $200 per week (i.e. over $10,000 per year) and produced tax returns showing adjusted gross income of $2,058, $8,724, and $6,952 though he failed to file returns for two years. 727 F.Supp. at 245. These figures total $17,734. Baxter claimed no dependents, while Marsh claims an aunt.

**41.** Exhibit 26, pp. 16 to 22, discusses information from tax returns, loan applications, and other sources. The affidavit concludes that, "it appears that forms were prepared to substantiate a claim regardless of their validity."

**42.** "It would be impractical to attempt to list all the inconsistencies among the various stories told by Marsh and her accountants; this memorandum has only discussed some of them. The inconsistencies told by Marsh and her accountants are fundamental and indicate that they are willing to say whatever they think will help get a loan, avoid taxes, and prevent forfeiture."

of that evidence, and provides no interpretation. After over two and one-half years, she has only raised minor credibility issues about the evidence supporting probable cause, given conclusory denials, and made immaterial assertions. She apparently attempted to create a genuine issue on the ultimate question of whether the property is proceeds of drug money, but in essence purports to have done so in only three ways.

First, she says the United States has not proved the property to be proceeds. Second, she denies it is proceeds. Third, she provides some records of minor payments. The first is an error of law, since the United States has only to show probable cause. The second is inadequate under Rule 56(e) and relevant Supreme Court and Fourth Circuit cases, since mere denials and conclusory assertions are insufficient to raise *genuine* issues of fact, even if made in affidavits. The third does not raise a *material* issue of fact, since she provides no evidence that traces these minor payments from untainted funds.[43]

Therefore the answer to the second question must be that Marsh has not carried her burden to raise a genuine issue of material fact.

## INNOCENT OWNER

Marsh and the United States have also raised issues about the statutory innocent owner defense.[44]

■ The innocent owner defense is an affirmative defense. *United States v. Certain Real Property*, 922 F.2d 129, 130 (2d Cir.

1990); *United States v. 15824 W. 143rd St.*, 736 F.Supp. 882, 883 (N.D.Ill.1990). Failure to plead the defense in the answer waives it. Fed.R.Civ.P. 8(c). A claimant is uniquely in possession of the evidence relating to ownership, knowledge, state of mind, and other factors to meet this burden. Marsh's answer did *not* assert the innocent owner defense. Her position has been that drug money was not used to finance the property,[45] rather than that drug money was used but she did not know it.

■ Further, even if Marsh had pleaded this defense, she has not met her burden to submit affirmative evidence to raise a genuine issue of fact. She has not submitted an affidavit in which she denies knowledge, explains how drug money was used without her knowledge and consent, or otherwise meets the requirements for innocent ownership.[46] Under the circumstances of this case, it is implausible that drug money could finance acquisition of the property without the owner's knowledge.[47]

Finally, the Fourth Circuit has interpreted the interaction of the relation back doctrine and the innocent owner defense so that one who acquires title to property that is the proceeds of drug dealing, without any knowledge at all that it is proceeds, cannot obtain good title so as to prevent forfeiture, at least unless they are a bona fide purchaser for value. *In re One 1985 Nissan*, 889 F.2d 1317, 1321 n. 4, 5 and 1322 (4th Cir.1989) (*en banc*) (seven judges held the relation back doctrine precluded recipients of property ac-

**43.** Further, even if minor payments were proved to be untainted, the whole property was involved in and facilitated the money laundering of the tainted funds, and is therefore forfeitable as discussed above.

**44.** 18 U.S.C. § 981(a)(2); 21 U.S.C. § 881(a)(6) and (a)(7) (concluding clauses of each subsection).

**45.** E.G. Marsh's answer, Dkt. 11, ¶ 25.

**46.** *See e.g. United States v. One 1980 Bertram 58' Motor Yacht*, 876 F.2d 884, 888–889 (11th Cir. 1989) (the owner could not meet his burden to be an innocent owner because the obviously suspect nature of an offer of a $50,000 cash deposit to take it out for sea trial required the owner to take

precautions to ensure that the yacht was not being bought for drug dealing; the "most minimal precautions" would have included: (1) obtaining positive identification of the person he was dealing with, (2) checking the person's reputation in the business community, and (3) checking with law enforcement officials to determine if the person is involved with drugs); *United States v. $267,961.07*, 916 F.2d 1104, 1108–09 (6th Cir. 1990) (husband and wife's only source of income was disability benefits and seizure of cash and guns persuasive evidence that wife's claim of innocent ownership of marital home was baseless, therefore "entry of summary judgment *sua sponte* may well be appropriate.").

**47.** *Matsushita, supra.*

quired with drug money from preventing its forfeiture, even though they were innocent of all knowledge of the drug dealing, since the property had vested in the United States when it was bought with drug money and therefore the drug dealer could not give good title to anyone; the majority refused to announce in dicta, as suggested by three judges who concurred in the judgment, an exception to the relation back doctrine for innocent purchasers for value). There is probable cause to believe that drug money was used to acquire defendant property. Therefore, unless Marsh traces the purchase and construction money to untainted funds, she cannot prove she acquired good title any more than Caplin & Drysdale or White's personal representative and children. *Id.* at 1321.

## COUNTERCLAIMS

Marsh's answer asserted the United States negligently "breached its duty of due care which it owed to claimant," and that she suffered "public embarrassment, ridicule, personal anxiety and economic loss," "severe anxiety causing her loss of sleep and loss of appetite," loss of "the peaceful enjoyment of her property."[48] Finally she attempted to turn a statutory shield for the government and its agents into a sword against the government by arguing that 28 U.S.C. § 2465 can entitle her to costs and attorney fees.

The United States seized the property pursuant to a warrant issued by the Magistrate Judge after a determination of probable cause. "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). "Warrant affidavits are

presumed to be valid.... However, a defendant may impeach the affiant by showing deliberate falsity or reckless disregard for the truth." *United States v. Jones,* 913 F.2d 174, 176 (4th Cir.1990). "[A] ruling on probable cause may not be disturbed unless clearly erroneous." *United States v. Dennis,* No. 89–5654, slip op. at 12 (4th Cir.1990) [919 F.2d 734 (table) ] (unpublished per curiam decision; the honorable James B. McMillan (W.D.N.C.) on panel).

■ Congress has precluded damages for seizures for forfeiture if there is a finding of probable cause. 28 U.S.C. § 2465. *See also United States v. B & M Used Cars,* 860 F.2d 121, 124–25 (4th Cir.1988). Marsh cannot establish that the United States committed a tort by carrying out the lawful order of this Court. She has provided no precedent for her counterclaims, either in substance or jurisdiction.

There can be no admiralty jurisdiction, as asserted by Marsh, since the alleged tortious wrong did not occur on a navigable water and also since there was no relationship between the alleged wrong and some maritime service, navigation, or commerce on navigable waters. *See Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). There can be no jurisdiction under the Federal Tort Claims Act as asserted by Marsh, since Congress has expressly precluded tort claims arising from the seizures of property by law enforcement officers. 28 U.S.C. § 2680(c). This express reservation of sovereign immunity has been applied to law enforcement officers effecting seizure for forfeiture.[49] Further,

---

48. Note searches and arrests by law enforcement may have similar effects, but when these are carried out in accordance with a judicially issued warrant, liability for the government or its agents is highly unlikely. *See e.g. Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Torchinsky v. Siwinski,* 942 F.2d 257 (4th Cir.1991).

49. *Ysasi v. Rivkind,* 856 F.2d 1520, 1524–25 (Fed.Cir.1988) (INS seizure); *United States v. $149,345 U.S. Currency,* 747 F.2d 1278, 1282–83 (9th Cir.1984) (DEA seizure under § 881); *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1491 (10th Cir.) (Dept. of Agriculture); *United States v. Lockheed L–188 Aircraft,* 656 F.2d 390, 397 (9th Cir.1979) (FAA); *United States v. One (1) 1972 Wood 19 Ft. Custom Boat,* 501 F.2d 1327, 1330 (5th Cir.1974); *Vu v. Meese,* 755 F.Supp. 1375, 1384 (E.D.La.1991) (Coast Guard drug seizure); *Sterling v. United States,* 749 F.Supp. 1202, 1212–13 (E.D.N.Y.1990) (DEA § 881). *See also Kosak v. United States,* 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984)

"the choice to proceed or not to proceed [with litigation to effect a forfeiture] was one necessarily made in exercise of a discretionary function" and thereby barred by 28 U.S.C. § 2680(a). *United States v. Articles of Drug,* 601 F.Supp. 392, 398 (D.Neb.1984), *aff'd,* 825 F.2d 1238, 1248–49 (8th Cir.1987).

Marsh's continued assertions of these counterclaims has been frivolous, especially after the United States filed a memorandum showing their lack of jurisdiction and legal basis.[50] In *United States v. $288,914,* 722 F.Supp. 267, 272 (E.D.La.1989), the court imposed sanctions under Fed.R.Civ.P. 11 for a claimant's similar attempt to assert counterclaims against the United States in a forfeiture action without stating a basis. Claimant's response to the United States' motion to dismiss these counterclaims ignored the cases and statutory provisions cited by the United States showing lack of jurisdiction and lack of substantive merits and simply asserts a "duty of due care" and jurisdiction without citing any case.

Accordingly, there is no merit in the purported counterclaims, and they should be dismissed.

## REQUESTS FOR SANCTIONS AND ATTORNEYS FEES

Marsh has repeatedly filed motions asking inter alia for sanctions and legal fees against the United States.[51] The requests for sanctions against the United States were unsupported in law or fact, and appear substantially frivolous. In the complaint, the United States prayed for "the costs and disbursements of this action, including, but not limited to the expenses of maintenance and pro-

tection of defendant property as required by 28 U.S.C. § 1921" and has indicated that at an appropriate time it would move for sanctions for the actions of claimant's counsel which have served no purpose but delay and caused unnecessary proceedings and expenses by the Court. A separate order has been issued directing the United States to file any such motion with all its claims for costs and sanctions within 30 days after any judgment of forfeiture of this property becomes final. The court will not make any decision with regard to any such motion until it is before the court.

## RECOMMENDATIONS

Wherefore, based upon the foregoing, the undersigned respectfully recommends that:

(1) The defendant property (as defined in paragraph 4(a) of the complaint by reference to deeds on file in the Mecklenburg County Registry) be ordered condemned and forfeited to the Plaintiff, United States of America, so that no other right, title, or interest shall exist therein except for that set forth in the Consent Order with First Citizens Bank as filed on November 22, 1991; and

(2) The claim and counterclaims of Leola Marsh be dismissed.

## NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendations contained in this Memorandum must be filed within ten (10) days of service of same. Failure to file objections to this Memorandum with the district court will preclude the parties from

---

(§ 2680(c) bars damages during storage when seized for Customs forfeiture); *Formula One Motors Ltd. v. United States,* 777 F.2d 822 (2nd Cir.1985) (§ 2680(c) excludes liability for destructive search of car while in custody of DEA agents searching for imported drugs); *Milburn v. United States,* 647 F.Supp. 1521 (S.D.Fla.1986) (airplane forfeited by foreign government, stolen from that government and returned to United States; former owners sued United States under FTCA because U.S. Marshal seized it and returned it to the foreign government without giving the former owner notice and opportunity to contest its return; action barred by § 2680(c)).

**50.** Dkt. 19 and 20, filed November 21, 1989.

**51.** E.g. Dkt. 11 (answer filed September 21, 1989, containing counterclaims and prayer for costs including attorneys fees); 39 (motion to compel C–1 and McLendon depositions and other discovery, filed June 17, 1991); 44a (motion to compel more satisfactory answers to interrogatories and document requests, filed July 31, 1991); 62 (renewed assertion of counterclaims filed October 31, 1991); 63 (assertion of need for discovery of identity of confidential informant in support of counterclaims, filed November 1, 1991); 92 (reassertion of counterclaims).

**484**

raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied.* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

The Clerk is directed to certify copies of this Memorandum and Recommendation to the United States Attorney and counsel of record for the claimants.

This 14th day of February, 1992.